BARRETT, Circuit Judge,
dissenting, in which TJOFLAT, BIRCH and WILSON, Circuit Judges, join, and in which ANDERSON, Circuit Judge, joins in part:
Willie Santonio Manders sued Clinch County Sheriff Winston Peterson under 42 U.S.C. § 1983 for injuries Manders sustained when officers under Sheriff Peterson’s supervision struck him repeatedly in the face and bashed his head against a wall in the Clinch County Jail. According to Manders’s deposition testimony, the beating he sustained upon his arrival at the county jail eventually resulted in his admission to a mental hospital.
In Georgia, county jails such as the one where Manders was held are quintessentially local institutions that exist separate and apart from the state’s integrated system of prisons. Their operation is among the responsibilities of the county and, specifically, the county sheriff. Longstanding authority clearly establishes that local governments such as counties may be held liable under 42 U.S.C. § 1983 for policies they adopt or customary practices they tolerate in operating local governmental facilities. See Jinks v. Richland County, — U.S. —, 123 S.Ct. 1667, 1673, 155 L.Ed.2d 631 (2003) (unanimous opinion); Monell v. New York City Dep’t of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[1] In the past, therefore, plaintiffs such as Manders could be confident that violations of their constitutional rights in county jails would not go unremedied.
Today, however, the majority badly subverts the law of local governmental liability by holding that county sheriffs in Georgia act for the state, and thus are immune from suit by operation of the Eleventh Amendment, when they exercise policy-making authority over county jails. It reaches this conclusion by determining that even if Sheriff Peterson’s policies *1333 were responsible for inmate Manders’s beating, Peterson adopted these polices not in his role as jailer, but in carrying out the previously unknown “functions” of “establishing use-of-force policy at the jail and ... training and disciplining his deputies in that regard.” Majority Opinion at 1305-1306.
When confronted in the past with § 1983 claims based on a jail inmate’s treatment while in custody, we have always defined the relevant function as “operating a county jail.” See Turquitt v. Jefferson County, 137 F.3d 1285, 1288 (11th Cir.1998) (en banc); see also Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir.2001) (en banc) (quoting Turquitt); Lancaster v. Monroe County, 116 F.3d 1419, 1428 (1997). This has been our practice for good reason. The point of identifying the pertinent governmental function in each case is to keep our analysis focused on the discrete set of positive state law authorities that define the particular area of official responsibility at issue. Cf McMillian v. Monroe County, 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (requiring analysis of the “particular area” at issue and contrasting it with a “categorical, ‘all or nothing’ ” approach); City of St. Louis v. Praprotnik, 485 U.S. 112, 125, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (expressing confidence that state law will provide sufficient guidance when inquiry is focused on a “given area of a local government’s business”). This analytical purpose is inevitably frustrated if the notion of function is conflated with what is more properly deemed a general attribute of the defendant’s office, incidental to a range of official functions. Once our inquiry becomes tied to an attribute that is at issue in a variety of contexts, we face the danger of a sprawling inquiry spanning the whole corpus of state law.
Such is the case here. At bottom, the majority’s newly invented “function” is nothing more than the sheriffs lawful authority to use force. This power is implicated, at a greater or lesser degree of remove, in virtually all of a sheriffs areas of official responsibility. It is not a function but rather a general attribute of the sheriffs office.
By defining “function” in its unprecedented fashion, the majority dispenses with the guidance to be found in Georgia statutes clearly directing that Sheriff Peterson manages the Clinch County Jail for Clinch County.[2] It then fails to locate any equally clear authority addressing the question we must decide today. No guidance is to be found in the statute identifying circumstances under which sheriffs may deploy force, because this enactment establishes only that the same authority extends to state and local governmental actors alike. See Ga.Code Ann. § 17-4-20(d) (prohibiting either a “law enforcement agency of this state or of any political subdivision of this state” from limiting peace officers’ authority to use force) (emphasis added); Perry v. State, 204 Ga.App. 643, 419 S.E.2d 922, 924 (1992) (defining scope of sheriffs arrest power by way of Ga.Code Ann. § 17-4-20). Instead, the majority rifles through the rest of the Georgia Code, drawing indirect inferences from statutes addressing everything from registration of bail-bond sureties to execution of court process. In the course of its effort to integrate these state laws into a sort of unified theory of Georgia sheriffs, *1334 the majority deploys two arguments that misstate the law and have implications of tremendous breadth.
First, the majority suggests that sheriffs are entitled to Eleventh Amendment immunity because their authority to use force is conferred by the state. See Majority Opinion at 1319. This logic marks a blatant end-run around our function-by-function approach. As the majority itself points out, sheriffs may exercise force “in initial arrests, in subduing inmates in sessions of state superior courts, or in quelling disruptive inmates in county jails.” Id. If sheriffs are state agents simply because their authority to use force originates in state law, then it must be they act as state agents whenever engaged in a capacity that requires the deployment of force— which is to say, in virtually every function sheriffs have traditionally served.
Even more radically, this argument implies that Eleventh Amendment immunity extends beyond sheriffs to city police officers, county police officers, and even private security guards. All of these individuals, from the Chief of the Atlanta Police Department to the employee keeping watch over the cosmetics aisle of a department store, act on authority vested in them by state law when using force to effectuate arrests for violations of state law. See Allen v. City of Atlanta, 235 Ga.App. 516, 510 S.E.2d 64, 66 (1998) (striking down city police department’s policy governing officers’ discharge of their firearms on basis of conflict with Ga.Code Ann. § 17-4-20); Ga.Code Ann. § 36-8-5 (authorizing arrest by county police); id. § 17-4-60 (authorizing arrest by private parties); Cash v. State, 136 Ga. App. 149, 221 S.E.2d 63, 64 (1975) (approving store security officer’s arrest of shoplifter). Yet it is settled law that city police, county police, and security guards hired by private entities are not entitled to Eleventh Amendment immunity. City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); Pembaur v. City of Cincinnati, 475 U.S. 469, 473-74, 484-85, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); Farred v. Hicks, 915 F.2d 1530, 1532-33 (11th Cir.1990). The majority proffers no test to distinguish these officers and individuals from the county sheriffs whose exercise of force it newly designates a state function.[3]
The second untenable argument offered by the majority is that the sheriff is entitled to Eleventh Amendment immunity simply because the General Assembly defines the powers and duties of his or her office. Yet on this theory of what makes a public office an “arm of the state” immune from suit, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), there can be no such thing as local government, be *1335 cause all local government is by definition a creature of the state’s authority to attach powers and duties to particular offices. Indeed, as I shall discuss at greater length below, the Georgia Constitution authorizes the state legislature to define the powers and duties of the very officials most readily associated in Georgia with policy-making on behalf of local governments: county commissioners. To hold that county commissioners are entitled to Eleventh Amendment immunity plainly flouts established law. Nonetheless, this is precisely what the majority implies today.
In the end, identifying “force policy” as the function at issue in this case so broadens the inquiry required in applying the Eleventh Amendment that the majority’s opinion becomes a largely ad hoc survey of the Georgia Code. When we instead recognize jail operation as the proper focus of our inquiry, every relevant factor straightforwardly weighs against the conclusion that Sheriff Peterson, in carrying out this function, acts as an “arm of the state” such that the Eleventh Amendment immunizes him from suit in federal court.
I. DEFINITION OF SHERIFF’S OFFICE AND JAILS UNDER STATE LAW
The first factor relevant in our application of the Eleventh Amendment is how state law defines the entity or official sued as a defendant. We have previously found this factor to favor holding a sheriff unprotected by the Eleventh Amendment when the state constitution, as interpreted by the state supreme court, established that the “sheriff is a ‘county official’ and, as such, is an integral part of the ‘county.’ ” Hufford v. Rodgers, 912 F.2d 1338, 1341 (11th Cir.1990) (citation omitted).
The Georgia Constitution is unequivocal in its designation of sheriffs as “county officers.” Ga. Const, art. 9, § 1, ¶ 3. I have discussed the relevant provision and its history at some length in Grech v. Clayton County, 335 F.3d 1326, 2003 WL 21521761 (11th Cir.2003) (Barkett, J., concurring). Rather than revisit that discussion in full, I here note simply that the language, structure, and history of the Georgia Constitution overwhelmingly demonstrate an intent on the framers’ part to ratify more than one hundred years of Georgia case law recognizing the sheriffs independence from state lawmakers. Indeed, the drafters resoundingly rejected a suggestion that would have given the state legislature the power to decide whether the sheriffs office would exist and by whom it could be filled. Id. at n. 8 (Bark-ett, J., concurring). This designation of sheriffs as independent county officers militates against considering them arms of the state in any of their official functions.
With respect to the particular sheriffs function we must consider in this case, statutory law defining jails as county institutions perfectly complements the constitution’s definition of the sheriffs office. “By virtue of their offices, sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority, as prescribed by law.” Ga.Code Ann. § 42-4-l(a). A county “having the physical custody of an inmate” has the responsibility:
to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention; to defend any habeas corpus or other proceedings instituted by or on behalf of the inmate; and to bear all expenses relative to any escape and recapture, including the expenses of extradition.
Id. § 42-5-2(a). As governmental units charged with the custody of persons accused of crimes, counties maintain their jails through the efforts of their sheriffs. In performing this function, sheriffs cannot be decreed the arms of the state.
*1336 In order to reach a contrary conclusion, the majority finds it necessary to set aside the Georgia Constitution’s general characterization of sheriffs as county officers and the Georgia Code’s identification of jails as county institutions. To this end, it deploys its novel concept of “function” to distinguish the present case from one involving the duties specifically enumerated in Section 42-5-2(a), namely, “feeding, clothing, or providing medical care to inmates.” Majority Opinion at 1319. In the majority’s view, these duties and the sheriffs broader responsibility “to maintain” inmates are not implicated in this case because here we must consider not jail operation per se, but rather “Sheriff Peterson’s force policy, which happens to be at issue in the jail context....” Id. at 1319. A focus on “force policy,” however, does not identify any state law that illuminates the state or local character of this “function” as clearly as do statutes vesting counties with responsibility for jails. Rather, as already discussed, the Georgia statute authorizing sheriffs to use force sheds no light whatsoever on whether ■ the sheriff acts for the state or the county in doing so.
The majority compensates for this lack of direct guidance by turning to “the specific duties the State assigns to sheriffs,” “most” of which it regards as “integral” to the “State’s criminal justice system.” Id. at 1315-1319. In this connection, the majority discusses “state court and bond-related duties,” id. at 1315, as well as “the common law duties of sheriffs to enforce the laws and preserve the peace on behalf of the sovereign State.” Id. at 1312.[4] The problem with this approach is that law enforcement, court, and bond-related duties have nothing to do with the function at issue in this case, even on the majority’s definition of that function as “establishing use-of-force policy at the jail.” The beating to which Manders alleges he was subjected was neither connected with his arrest, which had already been effected by the time he entered the Clinch County Jail, nor incident to his transport to or from a courtroom.[5]
*1337 Hence the majority’s refusal to recognize jail operation as the pertinent function in this case ultimately becomes a license to dispense entirely with the function-by-function approach we apply in deciding claims of Eleventh Amendment immunity. Instead, the majority offers an ad hoc collection of Georgia laws pertaining not to jail operation, nor even to the function it has newly invented, but rather to the sheriffs “essential governmental nature.”[6] Majority Opinion at 1319. This looks very much like the “all or nothing” approach against which the Supreme Court has warned. See McMillian, 520 U.S. at 785, 117 S.Ct. 1734 (instructing that the question of whether a sheriff acts for the county or state requires attention to the sheriffs role “in a particular area, or on a particular issue”).
The majority also seeks to minimize the importance of statutes making sheriffs responsible for county jails by emphasizing that this responsibility devolves upon sheriffs by way of state law. See Majority Opinion at 1315 (discussing statutory and doctrinal authority establishing that sheriff is required by law to administer jails). In this connection, it contrasts the General Assembly’s authority to enact legislation pertaining to sheriffs, see Ga. Const, art. 9, § 1, ¶ 3(a), with the county commission’s lack of authority to enlarge or restrict the sheriffs charge.[7] See Ga. Const, art. 9, *1338 § 2, ¶ 1(c)(1). The General Assembly’s authority to alter the powers and duties attaching to the sheriffs office, however, indicates nothing more than its role as the seat of legislative power in Georgia. Put another way, the Assembly’s general authority to define the sheriffs office is a separate matter from our present concern with whether the laws it has enacted do in fact define the sheriff as an arm of the state.[8]
The majority’s neglect of this distinction is at the core of an argument that proves far too much. Not only sheriffs but all forms of “elective county office” are subject to the state’s sovereign prerogative to structure local government. Ga. Const, art. 9 § 2, ¶ 1(c)(1); see also, e.g., Ga.Code Ann. § 36-64^5 (requiring that local parks boards established by “the governing body of any county or municipality ... shall consist of a minimum of five persons and a maximum of nine persons, serving without pay,” and that generally the “terms of office of the members of the board shall be for five years”); id. § 36-74-5 (setting forth requirements for appointment, membership, compensation, and organization of local code enforcement boards). This is true of local government not only in Georgia but across this country. Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d 245 (stating that “political subdivisions exist solely at the whim and behest of their State” (internal quotation and alteration marks omitted)); City of Trenton v. New Jersey, 262 U.S. 182, 187, 43 S.Ct. 534, 67 L.Ed. 937 (1923) (“A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit.” (footnote and citation omitted)).
Indeed, the General Assembly may enlarge or contract the powers and duties not only of the sheriff, but also of the very institution most readily conceived as a repository of local policy-making authority in Georgia: the county governing authority, which in Clinch County is its board of commissioners. See 1933 Ga. Laws § 29, p. 467. Article Nine of the Georgia Constitution, which vests county commissioners with certain “home rule” powers, makes clear that this delegation “shall not restrict the authority of the General Assembly by general law to further define this power or to broaden, limit, or otherwise regulate the exercise thereof.” See Ga. Const, art. 9, § 2, ¶ 1(a). Accordingly, the General Assembly has created numerous duties on the part of commissioners. County commissioners must satisfy minimum training requirements, avoid conflicts of interest when purchasing goods and *1339 property for the county, and comply with certain disclosure and recusal rules when zoning actions come before them. See Ga. Code Ann. §§ 36-20-4, 36-1-14, 36-67A-2. Myriad other duties structure the county commission’s collective discharge of official functions. See, e.g., id. § 36-1-25 (requiring that official minutes be kept of all meetings); id. § 36-67-3 (requiring that official review of zoning proposals address six statutorily specified matters); id. § 36-9-3 (requiring that sales of real property be made to “the highest responsible bidder, either by sealed bids or by auction after due notice has been given”). Finally, the matters over which county commissions exercise legislative powers are those which state law entrusts to the counties’ home rule authority. See Stephenson v. Board of Comm’rs of Cobb County, 261 Ga. 399, 405 S.E.2d 488, 489 (1991); Mobley v. Polk County, 242 Ga. 798, 251 S.E.2d 538, 541 (1979) (“Neither the counties of this state nor their officers can do any act, make any contract, nor incur any liability not authorized by some legislative act applicable thereto.”).
If the enactment of laws making sheriffs responsible for jails entitles the sheriff to Eleventh Amendment protection, a logical inference is that state laws imposing duties on county commissioners likewise bring these locally elected representatives within the amendment’s ambit. This is a result starkly in opposition to the line of precedent holding that local governments are not entitled to sovereign immunity under the Eleventh Amendment. See Mt. Healthy, 429 U.S. at 280, 97 S.Ct. 568; Lincoln County v. Luning, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). It likewise undermines the rule that local governments may be liable under § 1983 for policies or customary practices that deprive individuals of federal rights. Monell, 436 U.S. at 690-91, 98 S.Ct. 2018. The majority fails to reckon with this opposition between established law and its argument that the mere existence of state laws tasking sheriffs with specific duties favors Eleventh Amendment immunity.
In sum, the majority’s designation of “force policy” as the function to consider in this case culminates in a fatally flawed analysis of how state law defines the defendant. Among the casualties of the majority’s misguided discussion are the function-by-function approach that our law compels and the well-established notion that local governmental entities, despite being defined by state law, are independent of the state.
Neither of the infirmities of the majority’s approach would arise were operation of a county jail recognized as the appropriate function to consider in this case. Rather, the question of how state law defines the sheriff in carrying out this function readily resolves itself upon consultation of statutes defining Georgia jails as county institutions. The first factor in our analysis thus strongly and unequivocally favors the conclusion that Sheriff Peterson is not, in operating a county jail, an arm of the state entitled to the protection of the Eleventh Amendment.
II. INDEPENDENCE FROM STATE CONTROL IN OPERATION OF COUNTY JAILS
The second factor in our Eleventh Amendment inquiry is the degree of control the state maintains over the defendant. Unlike other correctional facilities in Georgia, which are managed by a state department and overseen by a state board, jails are the exclusive domain of Georgia’s scores of county sheriffs, who manage these institutions independently of virtually all state oversight. A proper examination of county jails and sheriffs’ role in running them gives no indication of state control.
*1340 Georgia’s Code specifically charges each county’s sheriff with the duty of taking “custody of the jail and the bodies of such persons as are confined therein, along with the warrant or cause of commitment.” Ga. Code Ann. § 42-4-4(a)(l). Incident to this fundamental responsibility is the sheriffs obligation to “furnish persons confined in the jail with medical aid, heat, and blankets,” id. § 42-4-4(a)(2), as well as to commit persons to the jails of nearby counties should the local facility prove unsafe. Id. § 42-4-4(a)(3). The counties themselves build the jails operated by their sheriffs. Id. § 36-9-5(a).
In contrast, the state maintains a network of correctional facilities that exists separate and apart from jails. This state system encompasses “state correctional institutions” and “county correctional institutions,”[9] both of which are distinct from jails and receive prisoners only after they are convicted. See id. §§ 42-5-30; 42-5-53; 42-5-51; In re Prisoners Awaiting Transfer, 236 Ga. 516, 224 S.E.2d 905, 906 (1976). Unlike jails, both state and county correctional institutions must answer to state authorities: their wardens serve at the pleasure of the Georgia Board of Corrections, whose members are appointed by the governor. Ga.Code Ann. §§ 42-2-2(a), 42-5-30.[10] Moreover, such facilities operate under the “supervision and control” of the state Department of Corrections, pursuant to rules promulgated by the board. Id. §§ 42-2-5, 42 — 5—53(b); Wilkes County v. Arrendale, 227 Ga. 289, 180 S.E.2d 548, 549 (1971). In exercising this rule-making authority, the Board of Corrections has adopted regulations governing everything from inmates’ personal hygiene to the size of disciplinary isolation cells to the frequency of inspections. See Ga. Comp. R. & Regs. r. 125-2-3-.04 (hygiene); id. r. 125-3-2-.09 (disciplinary facilities); id. r. 25-3-1-.04 (inspections).
None of this regulation applies to sheriffs, a key indicator of the state of Georgia’s lack of immediate control over sheriffs’ exercise of custodial authority in county jails. See Ga.Code Ann. § 42-5-51(a) (stating that Department of Corrections “shall have no authority, jurisdiction, or responsibility” with respect to offenders sentenced to confinement in county jails). Although a sheriff who fails to carry out certain statutory responsibilities faces the possibility of fines for contempt or removal from office, id. § 42^-4(c), imposition of these sanctions requires formal proceedings in courts of law. Gipson v. Bowers, 263 Ga. 379, 434 S.E.2d 490, 491 (1993). Accountability to judicial enforcement establishes only that sheriffs’ offices in Georgia possess legal personality, not that the state controls the sheriff for purposes of our Eleventh Amendment analysis.
Moreover, whereas the state can order county correctional institutions to take custody of prisoners, it generally lacks authority to house prisoners in county jails without the approval of the local sheriff. The chief administrative officer of the Department of Corrections “may designate as a place of confinement any available, suit *1341 able, and appropriate state or county correctional institution in this state operated under the jurisdiction or supervision of the department.... Neither male nor female state inmates shall be assigned to serve in any manner in a county jail unless [upon] ... the approval of ... the sheriff or the jail administrator of the county.” Ga.Code Ann. § 42-5-51(d).[11] State court judges likewise lack authority to compel the sheriff to transfer a prisoner by way of a sua sponte determination that a particular jail is insecure. See In re Irvin, 254 Ga. 251, 328 S.E.2d 215, 218 (1985); Howington v. Wilson, 213 Ga. 664, 100 S.E.2d 726, 727 (1957). By contrast, sheriffs themselves have the authority under certain conditions to commit persons in their custody to jails in adjoining counties. See Ga.Code Ann. § 17-7-1.[12]
The most substantial oversight to which Georgia law subjects sheriffs involves not state but other county officers. The chapter of the Georgia Code titled “Jails” begins with the mandate that “sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority.” Id. § 42-4-l(a); Griffin v. Chatham County, 244 Ga. 628, 261 S.E.2d 570, 571-72 (1979) (citing predecessor provision in upholding county commission’s authority to compel sheriff to accept prisoners whom county had agreed to hold in detention). In aid of this supervisory function, county governing authorities have at their disposal the investigative powers of grand juries, see Ga.Code Ann. § 15-12-71(c), which must inspect jails annually and make appropriate recommendations to the county commission. Id. § 15-12-78. Notably, grand juries regularly advise county commissions with regard to “the treatment of the inmates,” id. 15-12-78, as well as the jail’s general “operations.” Id. § 15-12-71(b)(1).[13] County oversight of jails in *1342 Georgia thus sweeps more broadly than in Alabama. As we explained in Turquitt, 137 F.3d at 1289, “Alabama’s Constitution sends a clear message that a sheriff is a state officer, whose actions with respect to the well-being of jail inmates are most appropriately controlled by state officials,” whereas Alabama counties are primarily responsible only for the jail’s “physical plant.” Id. at 1290. Georgia counties’ broader supervisory role complements their correspondingly expansive responsibility to maintain not only the jails themselves but also the inmates in their custody. Ga.Code Ann. § 42-5-2(a). Counties are responsible not only for the health and humane treatment of jail inmates but also for certain costs bearing a more attenuated relationship to the maintenance of custody: they must defend habeas corpus actions and pay for the cost of any escape and recapture of prisoners. See id. § 42-5 — 2(a).
In sum, Georgia has created two different sorts of facilities for the custody of persons detained as a result of alleged or proven crimes. On the one hand is the set of facilities maintained directly by the state for the custody of most convicted felons. On the other are the jails of the state’s counties, which exist primarily to hold persons awaiting trial or convicted of minor offenses. The state has integrated its own correctional institutions within a unified system subject to the control of statewide agencies, which direct the appointment and removal of wardens, supervise operations, and decide which institutions will take custody of which prisoners. By contrast, Georgia’s county jails exist in relative isolation. Each is run by an independent sheriff under the supervision of a county governing authority, with no institutionalized mechanism for state oversight.[14] The sheriff may generally refuse to house state prisoners, and inasmuch as Georgia law carves out certain exceptions to this rule, it never intrudes upon the sheriffs’ independent custody over all persons confined in county jails. Sheriffs exercise this undiluted authority to operate what are indubitably county institutions.
As in its application of the first Eleventh Amendment factor, the majority slights the weight of state laws vesting counties and their sheriffs with authority over jails by relying on its unorthodox definition of “force policy” as the “function” at issue in *1343 this case. Thus it characterizes Georgia counties’ obligations with regard to “the jail structure and ... food, clothing, and medical necessities” as involving “wholly separate and distinct matters” from the function involved in this case. See Majority Opinion at 1304. After executing this maneuver, however, the majority once again fails to cite any law by which the state does control sheriffs with respect to the “force policy” function the majority has newly defined. Instead, the majority rests its application of the control factor on the observations that sheriffs must undergo training coordinated by a statewide association of sheriffs and the governor may suspend sheriffs for up to 90 days.[15] These points cannot bear the weight assigned them.
With respect to training, the majority must rely on hypothesis to relate its discussion to “force policy” at all. Sheriffs are required to undergo twenty hours of training “generally devoted to contemporary law enforcement, investigation, judicial process, and correction practices.” Ga.Code Ann. § 15-16-3(a), (e)(1). The lack of more specific authority notwithstanding, the majority decrees it “reasonable to assume” that this training “includes instruction on force policy and hiring and training deputies.” Majority Opinion at 1320. Reasonable or not, the control factor may be applied much more straightforwardly by observing simply that the sheriffs custodial responsibility for jails, including the treatment of inmates, is not subject to oversight from state correctional agencies.
The majority’s discussion also falters because it cannot be said that sheriffs’ training is in fact administered by the state. Rather, the training is overseen by the Georgia Sheriffs’ Association, a private organization comprising the state’s elected sheriffs. See Ga.Code Ann. § 15-16-3(e)(1); see also Georgia Sheriffs’ Association, Welcome, at www.georgiasheriffs.org (last visited Jun. 11, 2003). Given the association’s composition, it begs the question presently before us to characterize sheriffs’ training as a state-administered program: we are sitting en banc for the very purpose of determining whether the sheriffs who design and conduct this training are themselves state or county officials.
Finally, inasmuch as the majority means to assert that the mere existence of a training requirement establishes state control, its approach again proves too much. Not only the sheriff but also holders of the quintessential local governmental office, that of county commissioner, must satisfy a training requirement. See Ga.Code Ann. § 36-20-4 (requiring commissioners to complete 18 hours of training on matters pertaining to the administration of county governments). So too must city and coun *1344 ty police officers, see id. §§ 35-8-9, 35-8-21, 35-8-2(8)(A) (requiring basic training course prior to service and annual training thereafter), and private lawyers. See Ga. St. Bar R. 8-104(A) (setting forth annual continuing legal education requirement for members of bar). Just as the General Assembly may define the powers and duties which attach to local office, it may require that local office-holders and licensed professionals complete courses of training. This exercise of state sovereign authority does not mean that the persons regulated are subject to state “control” such that the Eleventh Amendment should immunize them from suit. The majority fails to reckon with this anomalous implication of its reliance on sheriffs’ annual training requirement in applying our second Eleventh Amendment factor.
The other component of the majority’s control analysis is its discussion of the Georgia governor’s power to suspend county sheriffs. While the governor indeed has the authority to suspend sheriffs by following a statutorily defined procedure, it is not clear why this power should be viewed as more decisive than the limits clearly circumscribing it. For one thing, the governor cannot act unilaterally to remove a county sheriff. See Gipson, 434 S.E.2d at 491 (stating that “the Governor and the Attorney General can take no official action against a sheriff unless there has been a criminal indictment”).[16] Not only do the relevant statutes vest the governor with no removal power, they also forbid him or her from suspending a sheriff for longer than ninety days. See Ga.Code Ann. § 15-16-26(c). Exercise of even this limited suspension power requires the governor to appoint and receive the affirmative recommendation of an investigatory committee, see id. § 15-16-26(c), on which county sheriffs themselves constitute a majority. Id. § 15-16-26(a). The governor’s real but limited suspension power and his lack of removal power are as readily viewed as evidence of a lack of control as of control.
In sum, the majority’s flawed conception of the function at issue in this case leads it to ignore a statutory scheme clearly rendering Sheriff Peterson independent from state corrections officials in his administration of the Clinch County Jail. At the same time, the majority’s discussion of “force policy” as the relevant function leads it to no comparably üluminating statutory guidance, but rather involves it in flawed or tendentious arguments based on the training program sheriffs must attend and the governor’s power to order suspensions of sheriffs for up to 90 days.
III. FUNDS
The third Eleventh Amendment factor is the source of a defendant’s funding. Sheriff Peterson’s operating budget is appropriated entirely by Clinch County. See *1345 Grech v. Clayton County, — F.3d at-(citing Ga.Code Ann. §§ 36-5-22.1, 15-16-20, 45-4-7, 15-16-5; Chaffin v. Calhoun, 262 Ga. 202, 203, 415 S.E.2d 906 (1992)). The county also appropriates other funds related to the function at issue in this case, namely, the costs of building and operating jails. Ga.Code Ann. §§ 36-9-5, 42-5-2(a).
The majority recognizes that “Clinch County bears the major burden of funding Sheriff Peterson’s office and the jail,” Majority Opinion at 1323, but it nonetheless ventures an argument that the funding factor ultimately “tilt[s]” in favor of Eleventh Amendment immunity. Id. at 1324. As is true of the majority’s application of the other relevant factors, it reaches this conclusion via a route that begins with its mistaken conception of the function at issue in this case. The majority relies on its novel notion of a “force policy” function to set aside statutes requiring counties to pay for the jail’s construction, upkeep, and operations. See Ga. Code Ann. §§ 36-9-5, 36-9-8, 42-5-2. It then addresses the matter of who funds the sheriff by way of speculation that is highly removed from any positive authority.
Specifically, the majority reprises the same tendentious assumptions and inferences set forth in its application of the control factor. It points out that the state pays for twenty hours of training (which, it assumes, must encompass instruction in the use of force), as well as for any costs incurred in the investigation of sheriffs. Although this funding pertains no more to “force policy” than to any other function of the sheriffs office, the majority chooses to regard it as particularly pertinent to this ease. It does not explain how funds appropriated for a training course of several days and the rare investigation of possible misconduct outweigh the counties’ obligation to finance jail construction and then pay all costs of their daily operation and maintenance, year in and year out.
The majority also remarks that counties’’ funding obligations, including minimum salary and bond requirements, are established under state law. Majority Opinion at 1323. These points are immaterial to our application of the funding factor, which addresses simply the origin of an entity’s funding, not the law under which funding obligations arise. See Tuveson v. Florida Governor’s Council on Indian Affairs, 734 F.2d 730, 732 (11th Cir.1984) (stating relevant question as “where funds for the entity are derived”). In implying a contrary rule, the majority’s analysis again conflates the state’s authority to structure local governmental entities — as by requiring each county to appropriate funds for a sheriffs office — with the sovereign immunity accorded by the Eleventh Amendment.
Moreover, Georgia courts have recognized that county commissions act autonomously in funding the sheriffs office so long as their appropriations preserve the sheriffs capacity to execute the basic functions of office. See Chaffin v. Calhoun, 262 Ga. 202, 415 S.E.2d 906, 908 (1992). Review of whether this minimum standard has been satisfied is for abuse of discretion, Board of Comm’rs of Randolph County v. Wilson, 260 Ga. 482, 396 S.E.2d 903, 904 (1990), and the cases amply demonstrate counties’ authority to make very substantial cuts in sheriffs’ funding. See Chaffin, 415 S.E.2d at 908 (upholding county commission’s reduction of sheriffs budget by 47 percent); Board of Comm’rs of Randolph County, 396 S.E.2d at 904 (upholding commission’s decision not to appropriate funds needed to pay deputy’s salary); Lovett v. Bussell, 242 Ga. 405, 249 S.E.2d 86, 86 (1978) (upholding commission’s decision not to appropriate funds necessary to supplement salaries of six deputies).
Finally, the majority asserts that “Clinch County sets the total budget but *1346 cannot dictate how Sheriff Peterson spends it.” Majority Opinion at 1323. This argument is both inapposite and mistaken. First of all, it conflates the control and funding factors. More importantly, it obscures the only point relevant to our Eleventh Amendment analysis: whatever the extent of county commissioners’ control, it is undisputed that the state exercises no control whatsoever over the sheriffs expenditures. Finally, the majority wrongly equates the “county,” of which Sheriff Peterson and members of the board of commissioners are coequal officers,[17] with the board of commissioners alone. Because Sheriff Peterson is himself a county officer, it is incoherent to say the county “cannot dictate” how his budget is spent.
IV. STATE’S LIABILITY FOR ADVERSE JUDGMENT
The final factor relevant in our analysis is the state’s legal liability for a judgment against the sheriff. A showing that the state would be liable for judgment militates with particular force in favor of holding Eleventh Amendment sovereign immunity to protect the defendant from suit in federal court; a showing that the state would not be hable cuts strongly against such immunity. Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); Auer v. Robbins, 519 U.S. 452, 456 n. 1, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (declining to extend Eleventh Amendment immunity to police commission, 80 percent of which was appointed by state governor, because “the city of St. Louis is responsible for the board’s financial liabilities” (internal citation omitted)).
Here, the majority is correct in concluding that Georgia law offers no indication that the state would be hable for a judgment against Sheriff Peterson. Majority Opinion at 1326-1327. It wrongly concludes, however, that Georgia law also unequivocally protects counties from liability for their sheriffs’ actions.
The majority cites a number of cases showing that the state of Georgia has, as a general matter, granted counties immunity from suit on causes of action arising under state law. Notably, it has done so under a statutory provision that stands apart from the enactment defining the state’s own immunity. Compare Ga.Code Ann. § 36-1-4 with id. § 50-21-20 et seq. Counties’ immunity from many state law causes of action does not render them immune from liability under 42 U.S.C. § 1983 for violations of federal rights. Howlett v. Rose, 496 U.S. 356, 376-77, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (“[S]ince the Court has held that municipal corporations and similar governmental entities are ‘persons,’ a state court entertaining a § 1983 action must adhere to that interpretation. Municipal defenses — including an assertion of. sovereign immunity — to a federal right of action are, of course, controlled by federal law.”) (citations omitted); Martinez v. California, 444 U.S. 277, 284 & n. 8, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (state law granting immunity to parole officers does not control question whether such officers have immunity under § 1983).
Georgia’s own courts have recognized as much. In Lowe v. Jones County, 231 Ga. App. 372, 499 S.E.2d 348, 350-51 (1998), the court reached the merits of a claim that a sheriffs training policies had violated the federal constitutional rights of the plaintiffs decedent. The plaintiff had named the sheriff and the county as defendants. Id. at 349. Thus, simply by reaching the merits, the court treated a § 1983 suit against a county sheriff as not implicating. the threshold immunity from suit to which state instrumentalities are entitled *1347 under the Eleventh Amendment. The court also stated explicitly that “local governments may be liable” for certain violations of federal rights, thereby conveying the view that a suit arising out of a sheriffs policies implicates the liability of the county, not the state. Id. at 350.
Also favoring the conclusion that Clinch County would satisfy a § 1988 judgment against Sheriff Peterson is the authority of county commissions to pay attorney fees incurred by sheriffs in defending civil rights actions in federal court. See Haywood v. Hughes, 238 Ga. 668, 235 S.E.2d 2, 3 (1977). While the majority is correct in pointing out that counties are not required to take this step, no county would have any incentive to defend actions against sheriffs were it true that a judgment would be the responsibility of the state.
While a defendant may be entitled to Eleventh Amendment immunity even when an adverse judgment will not implicate the state’s treasury, Regents of the Univ. of Cal, 519 U.S. at 431, 117 S.Ct. 900, liability for judgment remains the single most important factor in our analysis. Hess, 513 U.S. at 48-49, 115 S.Ct. 394 (identifying “prevention of federal-court judgments that must be paid out of a State’s treasury” as the “impetus for the Eleventh Amendment,” and citing with approval seven court of appeals decisions recognizing “vulnerability of the State’s purse as the most salient factor in Eleventh Amendment determinations”). Thus, when the state bears no liability for a defendant’s actions, this fact militates with particular force against allowing the defendant to invoke the Eleventh Amendment. For this reason, the authority indicating that Georgia incurs no liability in connection with judgments against county sheriffs simply cannot be ignored.[18] As with the rest of the state law we have examined in this case, the state’s non-liability for any judgment against Sheriff Peterson demands that we allow Manders’s suit to proceed.
CONCLUSION
In this case, each of the factors we normally apply to determine whether a defendant is entitled to Eleventh Amendment immunity weighs against extending such protection to Sheriff Peterson. Georgia law clearly defines Sheriff Peterson as a county officer and jails as county institutions; the state’s corrections authorities exercise no control over Sheriff Peterson in his operation of the county jail; Clinch County appropriates Sheriff Peterson’s operating budget and pays for the jail’s construction and upkeep; and there is no indication that a judgment against Sheriff Peterson would operate against the state of Georgia.
By inventing a previously unknown function as the purported focus of its analysis, the majority trades the clarity to be found in the Georgia law of county jails for a blur of inference and speculation. The upshot is a substantial blow to established law assuring citizens’ ability to hold local governments accountable for violations of the United States Constitution. See Jinks, 123 S.Ct. at 1673; Monell, 436 U.S. at 690-91, 98 S.Ct. 2018. A correct reading of Georgia law shows that county sheriffs operate county jails for the counties in which they serve. In every sense, a suit under 42 U.S.C. § 1983 against a county sheriff alleging mistreatment in a county *1348 jail is a suit against a local government. The Eleventh Amendment, which protects states, is inapplicable, and the decision of the district court should therefore be affirmed.
For the foregoing reasons, I dissent.

. Thus we and our sister circuits have previously held, correctly in my view, that claims against sheriffs in their official capacity for constitutional violations at county jails are claims against the relevant county. See, e.g., Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir.1999) (stating that jail inmate’s § 1983 "claim against Sheriff Jarvis in his official capacity is a claim against DeKalb County”); see also Streit v. County of Los Angeles, 236 F.3d 552, 564 (9th Cir.2001); DeGenova v. Sheriff of DuPage County, 209 F.3d 973, 977 (7th Cir.2000); Doe By and Through Doe v. Washington County, 150 F.3d 920, 923-24 (8th Cir.1998); Dotson v. Chester, 937 F.2d 920, 934 (4th Cir.1991); Blackburn v. Snow, 771 F.2d 556, 571 (1st Cir.1985).

. Since 1863, the Georgia Code has provided that sheriffs are "Jailers of the counties.” Ga. Code § 331 (1863). Today, it provides that "sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority.” Ga.Code Ann. § 42-4-1 (a) (1997). Moreover, it is counties that have the "physical custody” of inmates in their jails and are therefore bound to "maintain” them, as by furnishing “food, clothing, and any needed medical and hospital attention.” Id. § 42-5-2(a).

. To be sure, the majority endeavors to articulate such a distinction by stating that ''[a] city delegates and exercises its policing function through its city police officers and a county through county police officers,” whereas "the State delegates and performs certain state policing and corrections functions through several law enforcement agencies, including sheriffs....” Majority Opinion at 1319-1320 n. 35. This purported distinction presupposes an answer to the very question at issue in this appeal, namely, whether county sheriffs in Georgia act for the state. Because the analysis by which the majority reaches its affirmative answer rests in part on an attribute common to all peace officers in Georgia— namely, the conferment by state law of a power to effect arrests by force. — it would seem to follow that not only sheriffs but also city and county police officers could be regarded as state actors. Apparently this is not so. While the majority's distinction escapes me, I certainly agree that city and county police officers do not generally act as arms of the state, and thus I am reassured by today’s promise that the "hypothetical scenarios” raised by the majority's reasoning will remain, after all, merely hypothetical. Majority Opinion at 1319-1320 n. 35.

. The majority also points to sheriffs’ duty to detain certain prisoners in county jails for a limited period after they have been committed to state custody. Majority Opinion at 1319; id. at 1315-1316. Assuming for purposes of argument that to this extent state law does define sheriffs as "arms of the state," the point has little force in this case. First of all, Manders was not committed to state custody at any point during his detention at the Clinch County Jail. Second, the special categories of prisoners discussed by the majority — consisting mainly of persons appealing conviction, awaiting imposition of suspended sentence, or serving previously probated sentences revoked on the basis of minor offenses — are clearly minor exceptions to the general rule. In operating a jail, the sheriff exercises custody primarily over pretrial detainees and persons convicted of misdemeanors. With respect to these much broader categories of prisoner, it is the county rather than the state that is responsible for the detention and well-being of persons in the sheriff’s custody. Ga. Code Ann. § 42-5-51. I discuss below the one other category of prisoners specially singled out by the majority: persons whom the Georgia Department of Corrections temporarily pays counties a per diem fee to house due to overcrowding in state prisons. See infra note 11.

. Remarkably, the majority goes so far as to suggest at one point that detaining accused criminals is always and everywhere a "state function” whenever offenders are charged with "state felonies.” See Majority Opinion at 1318 n.33. The reasoning appears to be that the enactment of state laws defining felony offenses makes all persons charged with the commission of a felony "state offenders,” and accordingly entitles their custodians to Eleventh Amendment protection from at least some suits. This infirm logic marks a variation on the argument that Sheriff Peterson is entitled to Eleventh Amendment immunity whenever he exercises his authority under state law to use force in making arrests. Just as the majority’s reliance on Georgia’s use-of-force statute implies that every sheriff, city *1337 police officer, and store security guard must be a state actor, so its discernment of a “state function” from the mere existence of state penal codes implies that every one of this country’s jails, detention units, and holding cells must be a state institution. That implication defies the longstanding amenability of local governments to suit for violating the constitutional rights of persons held in local jails on state charges. See, e.g., Jinks, 123 S.Ct. at 1673 (stating that claim arising out of prisoner’s death in county detention facility lay against "a political subdivision” of the state, rather than state itself, when prisoner had been arrested for failing to pay child support); Goodson v. City of Atlanta, 763 F.2d 1381, 1387-88 (11th Cir.1985) (upholding award of $45,000 in damages against city of Atlanta for conditions of confinement suffered by plaintiff while detained in Atlanta City Jail on charge of rape).

.Plainly baffling, then, is the majority’s charge that this dissent, in taking jail operation as the pertinent function, "defines the Sheriff's conduct at a higher level of abstraction” than the majority itself. Majority Opinion at 1309 n. 9. Divination of the sheriff's “essence" would seem to involve abstraction of a very high order. By contrast, the concrete function of jail operation focuses our inquiry on positive state legal authority directly relevant to this case, namely, the Georgia statute that makes sheriffs "jailers of the counties.” Ga.CodeAnn. § 42-4-1 (a).
The majority recognizes that counties may be liable for constitutional deprivations arising out of certain aspects of jail administration. See Majority Opinion at 1322, 1323 & n. 43 (distinguishing Manders’s suit from one involving provision of "food, clothing, and any needed medical and hospital attention” to jail detainees, as required under Ga.Code Ann. § 42-5-2(a)). While I agree with the majority that counties are responsible for providing prisoners with these basic necessities, I believe their responsibility extends much more broadly to all aspects of operating county jails.

.The majority likewise emphasizes Georgia cases stating that the sheriff is "not an employee of the county commission." Board of Comm’rs of Randolph County v. Wilson, 260 Ga. 482, 396 S.E.2d 903, 903 (1990) (emphasis added); see also Boswell v. Bramlett, 274 Ga. 50, 549 S.E.2d 100, 102 (2001) (explaining that employees of "constitutionally elected officers of a county,” such as sheriffs, are not employees of the county "as represented by the local governing authority”). It then reads this authority for the very different rule that the sheriff is not an employee of the county. Majority Opinion at 1319-1320. That interpretive leap finds no support in Georgia law. As I discuss below, see infra note 15, Georgia law establishes that sheriffs are constitutional county officers independent of county commissions. This independence does not unfasten sheriffs from local government, but rather vests them with final policy-making authority over those county functions entrusted to their office. That sheriffs are not employees of *1338 county commissions reflects nothing more than this separation of powers.

. The majority explicitly recognizes that "ultimate control of every state-created entity resides with the State and that the State may destroy or reshape any political subdivision as it sees fit.” Majority Opinion at 1322 n. 41. It then maintains that this elemental form of state sovereignty is not the sole basis for its conclusion that Georgia law defines Sheriff Peterson as a state officer. Yet the majority's discussion relies first, foremost, and throughout on the clauses of the Georgia Constitution cited above, which provide simply that (1) the state’s General Assembly may legislate on matters pertaining to the elective county office of sheriff and (2) county commissions may not so legislate. See Majority Opinion at 1309-1310 (citing Ga. Const, art. 9, § 1, ¶ 3(a), which provides that sheriffs, along with other county officers, "shall have such qualifications, powers, and duties as provided by general law”); id. at 1310, 1311, 1323-1324 (citing Ga. Const, art. 9, § 2, ¶ 1(c)(1), which provides that county commissions' powers "shall not be construed to extend to ... [a]ction affecting any elective county office”). Those provisions do no more than articulate, with respect to elective county offices, precisely the elemental form of state sovereignty which the majority insists is not the basis of its argument.

. Georgia’s Code uses the term "county correctional institutions” to refer not to correctional facilities in a generic sense but specifically to work camps that are distinct from county jails and municipal detention units. See 1973 Op. Ga. Att’y Gen. 117 (identifying "county correctional institutions” as county public works camps). Sheriff Peterson recognizes the distinction in a brief filed with this Court. See Reply Brief of Appellant, Sept. 21, 2001, at 1-2 ("County correctional institutions are entirely different facilities from county jails.”).

. In the case of county correctional institutions, wardens are appointed by county governing authorities "subject to approval” of the board of corrections, and they serve "at the pleasure of the county or the board.” Ga. Code Ann. § 42-5-30.

.The majority identifies one exception to this categorical statutory command. Under Georgia law and in exchange for a per diem fee, sheriffs maintain temporary custody of prisoners whom the Department of Corrections is unable to transfer to state prisons due to overcrowding in these facilities. See Clayton County v. Evans, 258 Ga. 146, 366 S.E.2d 282, 282-83 (1988). Yet the Department of Corrections enjoys no more authority with respect to these inmates’ custody than with respect to the sheriff’s custody of all other persons confined in county jails. The detailed regulations promulgated for the administration of state prisons remain wholly inoperative. Moreover, the very fact that the department must pay a per diem fee in this connection, see Ga.Code Ann. § 42-5-51(c), demonstrates that state law does not transform the sheriff maintaining such prisoners into a state agent, but rather continues to recognize jails as local entities with which the state enters into an essentially contractual relationship. Accord Clayton County, 366 S.E.2d at 283 (rejecting proposition that prisoners housed in county jail for per diem fee "were ‘assigned’ to serve sentences in the county's jail without the county's approval” and characterizing them instead as “merely temporarily incarcerated in the county jail, with the reimbursement provided by § 42-5-51(c)/ until such time as space could be made available for their transfer to a state correctional institution”). The arrangement through which state and local authorities in Georgia cooperate for the purpose of relieving overcrowding in state prisons fails to demonstrate that the state exercises control over county sheriffs.

. Complementing this authority is the obligation of sheriffs to accept prisoners from other counties upon receipt of an advance payment of fees and costs. Ga.Code Ann. § 17-7-2.

. The majority characterizes the grand jury’s inspection of county jails as incident to the "well-established function of grand juries in the State’s justice system.” Majority Opinion at 1322-1323 n. 40. That general role is simply immaterial to the present case, which addresses the particular function of jail administration. As the majority acknowledges, grand juries inform county commissions about the "treatment of inmates” generally. The breadth of this advisory function co *1342 incides with counties’ general responsibility for sheriffs' management of county jails.

. The majority seeks to minimize the importance of sheriffs' independence from Georgia’s integrated corrections system by remarking that the existence of a statewide Department of Corrections "does not preclude the State from [also] utilizing other law enforcement agencies, such as sheriffs, to perform the State’s incarceration function for state offenders.” Majority Opinion at 1318 n. 33. Be this as it may, the only reason given by the majority for regarding Sheriff Peterson as acting for the state at all, with respect to prisoners such as Willie Manders, is its pronouncement that sheriffs engage in a state function whenever they detain persons charged with felonies. Id. As discussed above, however, the operation of county jails cannot be regarded as a state function merely because the elements of felony offenses are found in state penal codes. See supra note 5. Even were this mistaken premise conceded, the relevant point with respect to the control factor would remain that county sheriffs discharge a "State[] incarceration function” independently of the only state agency with supervisory authority over state correctional facilities. Thus, the control factor would continue to militate against the extension of Eleventh Amendment immunity. The majority’s elision of this point ultimately consists in the argument that because sheriffs (1) exercise independent custodial authority and (2) are state actors, their own independence — their self-control, if you will — should be considered "state control.” The belabored tautology of this reasoning is less than illuminating with respect to our present inquiry.

. Apart from its argument that training requirements and the state’s limited suspension power establish state control, the majority muddies its analysis by trying to establish the complementary proposition that Georgia counties have no control over the function at issue in this case. Majority Opinion at 1321— 1322. Since Sheriff Peterson is himself an independent county officer under Georgia's Constitution, the only way to make sense of this assertion is to read it as premised on the county commission's lack of control over the sheriff.
As I have explained in my concurrence in Grech, 335 F.3d 1326, 2003 WL 21521761, however, the county commission is not the only institution that acts for the county. Georgia has structured its county governments to vest authority for different functions in different, coequal offices interacting in a manner akin to the federal government’s separation of powers. Thus, the sheriff's independence from the county commission should be interpreted not as independence from the county, but rather as independent authority to act for the county with respect to the functions entrusted his office.

. The majority distinguishes Gipson as a case construing the statute that defines the governor’s power to remove any and every public official, rather than the statute conferring a more specific power to temporarily suspend sheriffs. See Majority Opinion at 1321 n. 38. Yet it is undisputed that the governor has no more power to remove sheriffs than any other officials. The majority chooses to ignore this and instead focus exclusively on suspension. As I explain in the text, the significance which the majority assigns the governor's suspension power indicates only its need to rest an otherwise unsupported argument on inferences drawn from a law that could as easily be interpreted to the opposite effect. While the majority seems to fault the Georgia Supreme Court for speaking too broadly when it explained in Gipson that the governor “can take no official action against a sheriff” absent criminal indictment, see Majority Opinion at 1321 n. 38, one might also regard the high court’s unanimous agreement upon such categorical language as an indication of the conception of sheriffs held by jurists better trained than we in Georgia law.

. See supra note 15.

. The majority seeks to mitigate the force of the state’s non-liability by speaking in broad terms of the potential for judgments against sheriffs to “interfere with a state program or function.” Majority Opinion at 1329. This argument begs the question. In drawing a connection between sheriffs and "a state program,” the majority presumes the very point it has failed to establish in its application of our first three Eleventh Amendment factors.